399 So.2d 41 (1981)
Robert C. MALT and B. Ann Malt, His Wife, Appellants,
v.
Samuel H. DEESE and Dorothy M. Deese, His Wife, Appellees.
No. 79-906.
District Court of Appeal of Florida, Fourth District.
May 20, 1981.
*42 Robert B. Cook of DeSantis, Cook, Meehan, Cohen, Gaskill & Silverman, P.A., North Palm Beach, for appellants.
James R. Hustad of Hustad & Kurtz, West Palm Beach, for appellees.
GLICKSTEIN, Judge.
This is a timely appeal by Mr. and Mrs. Malt, the lessors/sellers, of property in Manalapan, Florida, from a final judgment of specific performance, together with an award of attorneys' fees in favor of Mr. and Mrs. Deese, the lessees/buyers. We affirm.
Mr. Malt is a homebuilder and real estate broker. The parties met in 1973 when Mr. Deese responded to an advertisement for the sale of a waterfront home in Manalapan owned by the Malts.[1] Upon their meeting, Mr. Deese made known to Mr. Malt his ownership of Letters Patent for a foldable extension ladder and the existence of an Exclusive License Agreement he had given to International Leisure Industries, Inc. for the manufacture and sale of the ladder.[2] Mr. Malt's interest was apparently aroused to the extent that he let the Deeses into possession of the home without requiring any money from them.[3]
On September 20, 1974, the board of directors of International Leisure held a special meting which Mr. Deese attended as a guest. The following motion was passed unanimously:
That the board authorize payment of all arrears in royalties for the ladder to be paid to October 1974 at $200.00 per month. Additionally, a prepayment advance of royalties in the amount of $1,400 paid through May 31, 1975  for eight months, at which time a minimum of $2,000 per month be paid Mr. Deese against accrued ladder royalties.
The record indicates that shortly thereafter Mr. Deese may have received $1,400 from the corporation and turned it over to Mr. Malt as some consideration for the Deeses' occupancy from May, 1973, of the subject property.
Shortly after the September, 1974, board of directors meeting, Mr. Malt and Mr. Deese set about the preparation of a Lease, Contract and Assignment of Royalty Agreement, which was ultimately signed by Mr. and Mrs. Malt and Mr. and Mrs. Deese on December 10, 1974, a portion of which provides:
1) The closing shall be on or before the first day of October, 1979.
2) The purchase price shall be One Hundred Thousand Dollars ($100,000.00) cash, plus an additional cash amount equal to all taxes, hazard insurance and *43 the interest of 8.2 per cent per annum paid on that certain first mortgage in the amount of $100,000 held by Community Federal Savings and Loan Association of Riviera Beach, Florida, encumbering said property. Said amounts shall be computed and prorated from the date Lessees took possession of the premises; to-wit: May 18, 1973, to the above date of closing.
3) It is understood and agreed that the royalties paid to Lessors pursuant to the terms of this agreement shall act as a reduction in said purchase price in the following manner:
(a) The first $100,000 of royalty payments shall be retained by Lessors.
(b) Any additional payments shall first be applied to all taxes, hazard insurance, and interest, as noted in Article 2 above then the remainder, if any, shall apply to the reduction of said $100,000 mortgage held by Community Federal Savings and Loan Association of Riviera Beach, Florida.
4) Provided that, prior to the above date of closing, royalty payments to the Lessors have at least equalled $200,000, Lessor shall convey title to the premises to the Lessees by a general warranty deed subject only to the easements and restrictions common to the neighborhood. In the event, by the date of closing, said royalty payments to the Lessors have not at least equalled the purchase price, including said taxes, insurance and interest, the Lessees, jointly and severally, hereby promise to pay forthwith to the Lessors, a sum of money equal to the full purchase price plus the taxes, insurance and interest referred to above less whatever royalty amounts have been paid to Lessors.
The Assignment of Royalties portion provides, in part:
1) Commencing from the date hereof, the Lessors shall be entitled to 100% of the royalties and any other monies or considerations paid by the licensee or its assigns under the terms of said exclusive license agreement. Said payment shall be for a period of five (5) years from the date of this agreement or until $200,000 has been received.
2) Subsequent to the time that the Lessor receives a total of $200,000 in accordance with the provisions and time requirements of this agreement, the Lessor shall receive 10 percent of all royalties and other considerations paid to the Lessee or its assigns as long as the Lessee or its assigns receive royalty payments for the attached ladder patent.
3) During the time period from November 1, 1974, until date of closing, October, 1, 1979, the Lessee shall pay to the Lessor all of the royalties received by the Lessee under its license agreement, not to exceed that amount as stated in Article 1, above, but not less than $400.00 per month, beginning November 1, 1974, and continuing until time of closing. In the event the Lessee leases the property to a third party during term of this agreement, and the Lessor at that time is not receiving $2,000 per month, all of the lease monies over $400.00 per month, which is guaranteed by the Lessee, shall be paid to the Lessor and applied to reduce the balance owed by Lessee to Lessor at which time the Lessor is receiving a minimum of $2,000 per month, any rentals received by the Lessee on the described property shall be retained by the Lessee.
After December 10, 1974, the Malts received exactly $400 per month from the Deeses. Unknown to the Malts, by June of 1975, International Leisure's board of directors voted at a special meeting to take the corporation into voluntary bankruptcy. The ladder had never been produced because it had never met the standards of the Occupational Safety and Health Administration and the corporation lacked capital. In this time frame, Mr. Malt was exhorting Mr. Deese to do something about the fact that no royalty payments were being received other than $400 per month actually being paid by Mr. Deese. On July 11, 1975, Mr. Malt wrote the corporation demanding on behalf of Mr. Deese and himself, the $2,000 per month royalties described in the minutes of the board's meeting on September 20, 1974.
*44 Mr. Malt decided in 1976 to rescind the agreement with the Deeses. However, instead of refusing any further payments, the Malts continued to accept monthly payments from the Deeses of $400 through November, 1978, when the trial of this case commenced. Mr. Malt's reason for accepting the $400 was that he wanted help in paying the mortgage on the home.
In January, 1977, the Malts instituted an action in the County Court in and for Palm Beach County to evict the Deeses on the bases that their monthly payments were tardy and that the Town or City of Point Manalapan had notified the Malts in November, 1976, that the Deeses were maintaining a nuisance by operating a garage in the home. The court found in favor of the Deeses.
On August 3, 1977, the Malts filed a complaint for cancellation of the December 10, 1974, agreement, alleging failure of consideration in that the agreement was based on the expectation of royalty payments which were not made.
Mr. Deese wrote to Mr. Malt on August 19, 1977, and proposed that he purchase the property by assuming the existing $100,000 mortgage on the home and paying the difference between the then present balance and the $100,000 purchase price. Mr. Deese also offered to "pay all interest, insurance, and taxes incurred since the existing mortgage was placed on the property, less all payments made" to Malt. Mr. Malt rejected the proposal.
On October 14, 1977, Mr. Deese sent a second letter to Mr. Malt, stating that he would like to exercise the purchase option as set forth in the December 10, 1974, agreement. Mr. Malt indicated that he would require $200,000 as the purchase price, plus taxes, interest and insurance. As Mr. Deese was willing to tender only $100,000, plus taxes, interest and insurance, the purchase was not consummated. Thereafter, the Deeses counterclaimed for specific performance.
The Malts amended their complaint to include four counts: (1) cancellation of the subject contract for failure and gross inadequacy of consideration by reason of nonpayment of royalties to plaintiffs; (2) cancellation of the contract for gross inadequacy of consideration due to the worthlessness of the patent assigned to plaintiff; (3) cancellation for Deese's misrepresentation that the patented product was a marketable commodity; and (4) reformation of the contract to reflect a purchase price of $200,000.
In their answer and affirmative defenses to the amended complaint, the Deeses pleaded payment as agreed, performance in good faith, and the Malts' acceptance of payment in ratification of the agreement. At trial the Deeses were permitted to amend their affirmative defenses by the addition of "estoppel by judgment," which referred to the earlier action in the county court.
The trial court denied both parties' motions for directed verdict, and subsequently entered judgment in favor of the Deeses on the complaint and counterclaim. The final judgment ordered the Deeses to pay the Malts the following sum: $100,000 plus an additional amount equal to all taxes, hazard insurance and interest of 8.2% per annum paid on the existing mortgage (said amount prorated from May 18, 1973), less all sums paid as rent (from May 18, 1973, to date of conveyance). On the Malts' motion for rehearing, the trial court ordered the conveyance by them to be free and clear of the existing mortgage. The Deeses' attorney was awarded $9,000 in fees.
The Malts' first point on appeal is that the trial court should have rescinded the December 10, 1974, agreement because of failure of consideration, inadequacy of consideration, and misrepresentation. Assuming each allegation to be true, the Malts, however, must be deemed to have ratified Mr. Deese's actions. The Malts not only continued to accept the $400 monthly payments long after they had every reason to believe there would be no royalties forthcoming from International Leisure, they even instituted an earlier action, using the December 10, 1974, agreement as the basis therefor. In Scocozzo v. General Development *45 Corp., 191 So.2d 572, 579 (Fla. 4th DCA 1966), this court adopted the chancellor's opinion as its own, saying:
"Rescission and cancellation are harsh remedies and therefore not favored by the courts. Courts of equity will not grant the remedy unless it clearly appears that the claimant is entitled thereto and has not by his own conduct waived his right to the relief claimed. Because of this view, slight circumstances, indicating a purpose or intent of the claimant to waive the right will bar relief. See Rood Company v. Board of Public Instruction, (Fla. 1958) 102 So.2d 139-142. One of the most familiar applications of the rule relating to the acceptance of benefits arises in the case of contracts. It has been repeatedly held that a person by the acceptance of benefits may be estopped from questioning the validity and effect of a contract; and, where one has an election to ratify or disaffirm a conveyance, he can either claim under or against it, but he cannot do both, and having adopted one course with knowledge of the facts, he cannot afterwards pursue the other."
See also Gladding Corp. v. Register, 293 So.2d 729 (Fla. 3d DCA 1974), cert. discharged 322 So.2d 911 (Fla. 1975); Tonkovich v. South Florida Citrus Industries, 202 So.2d 579 (Fla. 2d DCA 1967).
Even were we to disregard the existence of waiver, the record supports the trial court's decision upon the issue of rescission. First, we fail to see how there can be a failure of consideration when the parties' agreement expressly provides for a minimum monthly payment of $400, which is exactly the sum received. Second, inadequacy of consideration must generally be considered in connection with other inequitable circumstances in order to justify cancellation of an instrument. Douglas v. Ogle, 80 Fla. 42, 85 So. 243 (1920). Sub judice, the other inequitable circumstances would presumably be Mr. Deese's alleged misrepresentations. In the amended complaint the Malts alleged that Mr. Deese misrepresented the ladder to be marketable. The testimony on this point was as follows:
Q. Did Mr. Deese ever represent to you that the ladder was a marketable item?
A. Yes.
Q. How did he represent that to you?
A. Well, they gave me information that there were companies that had looked at the ladder, that they had been exposed to the ladder, that were interested in buying the ladder and that he had a contract with International Leisure Industries to manufacture and market the ladder and to pay him the royalties, and the company that International Leisure had engaged was in Hialeah to manufacture the ladder.
These representations of marketability described in the testimony are expressions of expectation or opinion, and as such are not actionable alone or in support of a claim of inadequate consideration. Smith v. Hollingsworth, 85 Fla. 431, 96 So. 394 (1923); Glass v. Craig, 83 Fla. 408, 91 So. 332 (1922). Appellants also attempted at trial to establish misrepresentation by showing that Mr. Deese knew the actual adverse financial condition of International Leisure and withheld such information from the Malts. Nonetheless, the Malts acted imprudently in expecting such disclosure from May, 1973, through December 10, 1974, since there was ample time and opportunity for them to make their own inquiries and inspections or to forego any further involvement should the avenues of investigation be blocked. We note that while Mr. Deese has only a ninth grade education, Mr. Malt holds a bachelor's degree in business administration, and attended a year of law school. In measuring the Malts' right to rely on Mr. Deese, the Malts had some obligation to use reasonable diligence for their own protection. Fote v. Reitano, 46 So.2d 891 (Fla. 1950). See also Gladding Corp. v. Register, supra.
The Malts' second point is that the trial court should not have awarded the Deeses specific performance on the latters' counterclaim. They first argue that the parties' *46 agreement is vague and inconsistent as to the purchase price in that paragraph 2 refers to a $100,000 figure while paragraph 4 refers to a $200,000 amount. The Deeses claim on appeal the purchase price to be $100,000 plus the Malts' costs for interest, taxes and insurance, less a credit for the royalties received, while the Malts contend the figure to be $200,000 plus, and minus the foregoing costs and credit, respectively.
Resolution of the ambiguity is a question of fact and we are bound by the findings of the trial court as long as they are supported by the record. The trial court found the interpretation by the Deeses to be correct. Mr. Deese's testimony supports this finding:
Well, originally, [Mr. Malt] ... was only to receive five percent of the royalty with no minimums, but then he determined that in order to enter into this contract, he felt that it was possible that, along the way, that the ladder might not produce all of the income that we thought that it would. So he would like to at least come out to where he would break even on the property, in the event that he didn't make the profit. So we entered into the final agreement on the terms that he had, at that time he felt like he had around $100,000 in the home and this hundred thousand dollar loan got him his money back. And at that time, he wanted to recover his hundred thousand dollars on the home, plus all of his interest, all the interest payments and taxes. In other words, he wanted it so the worst thing that could happen to him was that he would break even. And I agree it sounded reasonable, but he also wanted the chance to make a lot of money, if he was going to take a chance on not making any.
Based on its findings the trial court concluded, and we agree, that the contract, taken as a whole, is intelligible and sufficiently certain to entitle the Deeses to specific performance.[4] See English v. Clark, 289 So.2d 33 (Fla. 1st DCA 1974).
The Malts further argue that the Deeses were not entitled to specific performance because they failed to tender the purchase price. However, it is only necessary that a vendee establish that he has been ready, willing and able to pay the purchase price. Glave v. Brandlein, 196 So.2d 780 (Fla. 4th DCA 1967); Horwitz v. Grovpac, 286 So.2d 576 (Fla. 3d DCA 1973), cert. denied 293 So.2d 365 (Fla. 1974). We believe that Mr. Deese's letter of October 14, 1977, to Mr. Malt considered together with the testimony of the Deeses' sufficiently established the Deeses' willingness and ability to pay the purchase price.
The Malts lastly contend that the Deeses are entitled to attorneys' fees only if they prevail in their counterclaim for specific performance and not in the defense of the complaint for rescission and reformation. By our decision this point becomes moot. Nevertheless, we note that paragraph 7 of the parties' agreement of December 10, 1974, states:
7) Either party failing to comply with the terms of this entire agreement shall pay all expenses, including a reasonable attorney's fee, incurred by the other party because of that failure.
We construe the foregoing paragraph to mean that any action the Deeses were required to take to uphold as well as enforce the agreement entitled them to attorneys' fees.
Based on the foregoing, the trial court's decision is affirmed.
AFFIRMED.
DOWNEY and ANSTEAD, JJ., concur.
NOTES
[1] Mr. Malt's business partner, Jimmy Casto, had an interest in the home until the first half of 1974. Mr. Casto is not a party in this action.
[2] Mr. Deese's license agreement provided for his being paid a royalty equal to five per cent of net sales with a minimum royalty of $200.00 per month.
[3] Mr. Malt testified at trial that Mr. Deese could not afford to buy the home so the parties undertook discussions of Mr. Malt's being paid royalties which Mr. Deese expected to receive from his licensing agreement with International Leisure.
[4] Even without parol evidence we would probably reach the same conclusion based on the second sentence of paragraph 4 of the agreement. It provides that if the royalty payments have not equalled the purchase price, plus taxes, insurance, and interest, then the Deeses shall pay the purchase price, plus taxes, insurance and interest, less the royalty payments which have been paid by the Deeses.