191 So.2d 572 (1966)
John J. SCOCOZZO, Jr., and Sylvia B. Scocozzo, His Wife, Appellants,
v.
GENERAL DEVELOPMENT CORPORATION, a Foreign Corporation, Appellee.
No. 374.
District Court of Appeal of Florida. Fourth District.
November 9, 1966.
*573 Chester E. Clem, Jr., of Jackson & Clem, Vero Beach, for appellants.
P.D. Thomson and Richard Brickman, of Paul & Sams, Miami, for appellee.
ALLEN, WILLIAM P., Associate Judge.
The appellants, plaintiffs below, appeal from a decree denying them the right to rescind a contract for the purchase of certain property.
Appellants bought a lot and home in Sebastian Highlands Subdivision from the appellee, General Development Corporation. Negotiations for the purchase began in 1958, possession was taken by the appellants in 1959, and the sale was closed in 1960. Suit for rescission was filed in 1963.
The plaintiffs alleged that they were primarily a "boating" family and bought the home in Sebastian Highlands on Collier Creek because the defendant-appellee's agents represented to them that the creek was being developed into a navigable waterway in the future, which was to ultimately link up with the Sebastian and Indian rivers. However, the creek was only bulkheaded and broadened and is now only a mile long and completely landlocked and useless for boating purposes.
Extensive testimony was adduced in the court below and correspondence, sales brochures, advertisements and depositions were introduced.
The chancellor decided in favor of the defendant-appellee, General Development Corporation, holding that there was insufficient evidence to show fraud; that the contract provisions indicated there was no, or could be no, reliance by plaintiffs on any oral misrepresentations by General Development Corporation; and that there was ratification of the contract by the plaintiffs' acceptance of the new heating system.
The appellant presents the following three questions:
1. Was the proof presented at trial sufficient to prove clearly and convincingly that fraud and misrepresentation was practiced on the plaintiffs by the defendant in an effort to induce them to purchase property on Collier Creek in Sebastian Highlands Subdivision?
2. Were the representations made to the plaintiffs, through the agents of the defendant, General Development Corporation, sufficient to constitute fraud as a matter of law and sufficient to void the contract, thereby allowing the court to set aside the contract on the grounds that it had been induced by fraud?
3. Did the court err in holding that the acceptance of a heating system which the plaintiffs were entitled to receive under a prior agreement was a waiver of the plaintiffs' right to question the failure of the defendant to fulfill its representation that it would extend Collier Creek into the Sebastian River?
The appellee states the following questions:
1. The chancellor's findings and conclusions of fact are supported by substantial evidence in the record and the chancellor applied correct principles of law in reaching his decision. Therefore the final decree may not be set aside.

*574 2. The ruling of the chancellor was correct because even if the alleged misrepresentation were made, and even if plaintiffs had a right to and did rely thereon, plaintiffs waived their right to rescind by having ratified the contract and having accepted the benefits thereunder, and plaintiffs were also barred by laches.
3. The ruling of the chancellor was correct because plaintiffs failed to establish that they had a right to or that they did rely upon the alleged misrepresentation.
4. The ruling of the chancellor was correct because plaintiffs failed to prove any misrepresentation by defendant.
We are indebted to Judge D.C. Smith, the able chancellor who tried this case, for his very lucid opinion containing facts and law and shall adopt a large portion of his opinion as our own. In the final decree, Judge Smith stated:
"The Court finds from the evidence that the plaintiffs first became interested in Sebastian Highlands Subdivision through seeing an ad which appeared in Life magazine. On March 7, 1958, the plaintiffs stopped at the defendant's sales office in the Sebastian Highlands Yacht Club on U.S. Highway 1 and the Indian River at Sebastian, Florida. There they were shown brochures and a map which was on a wall in the Yacht Club, which brochures and map showed the proposed development of Sebastian Highlands Subdivision. The plaintiffs selected a certain lot and were taken out to see such lot and Collier Creek adjacent thereto. They then returned to the Yacht Club and made a $10.00 deposit on the lot, and shortly thereafter proceeded to their home at Islip, Long Island, New York. On March 11, 1958, a contract covering such lot was prepared by defendant and mailed to the plaintiffs, together with certain brochures, at their Long Island address. The plaintiff executed such contract and on April 2, 1958, returned it to the defendant, together with a check covering balance of down payment. Plaintiffs returned to Sebastian Highlands Subdivision about June 12, 1959, and again saw their lot and Collier Creek as then improved and being improved through widening and bulkheading. While at Sebastian Highlands on this occasion, plaintiffs selected a home to be built on their lot and executed a contract with defendant to build it for them and again returned to their home in New York. On December 1, 1959, plaintiffs returned to Sebastian Highlands Subdivision to live in their new home and have resided there since.
"Plaintiffs testified that defendant's agent stated to them on March 7, 1958, that Collier Creek was going to connect with the Sebastian River and plaintiffs could boat from the property they purchase through Collier Creek to the Sebastian River, from the Sebastian River into the Indian River and through the Inlet into the ocean.
"Two of defendant's officers and defendant's land developing architect and engineer testified that the defendant never planned for Collier Creek to be made navigable to the Sebastian River.
"Mr. Robert F. Mackle testified:
`Q During the time you were there, was there any plan or was there any discussion about extending Collier Creek into the Sebastian River?
A No, sir, never at any time.
Q Or extending it any place so it would run into the  so it would become navigable to the Atlantic Ocean?
A No, sir. It is what I would call an engineering impossibility. Nothing is impossible, but from my recollection of this particular land, from a Coast and Geodetic Survey, it would show this at 20-odd feet above sea level. Well, sea level from this property is a matter of  what *575 is it  a mile or a mile and a half? Well, I don't think engineers have found how to make water run uphill. You just couldn't do it. It would be the kind of thing you wouldn't consider doing.'
"Mr. James E. Vensel, land developing architect and engineer, testified:
`Prior to purchase of the property, it was analyzed by me in conjunction with the Mackles, that we would not be able to create a system of waterways within the property that would have access out to tidewater, more or less, with the exception possibly of the two 40-acres disjointed tracts that I mentioned earlier. Collier Creek being through the properties and the property being at approximately a 20 foot elevation, it was impractical either to dig a 20-foot deep waterway or to provide any other kind of access, because the natural channel of Collier Creek crosses through our property and left the property and passed through adjoining owners that probably we did not own prior to it reaching Sebastian River where it was really tidewater.'
"It (Collier Creek) was planned only as a drainage facility and a limited inland waterway to run into a lake at the boundary of the defendant's property or proposed development. The testimony shows that various inquiries were made of the defendant concerning Sebastian Highlands Subdivision and in answering those inquiries, the defendant represented:
`Our Sebastian Highlands Development is basically an inland community. However, we are developing Collier Creek, which runs through the development and will enter into a 25 acre lake which will offer fishing, boating and swimming within the development. It will not connect with the Indian River or the Atlantic Ocean, however. For the latter type of boating and fishing recreation, we have established a Yacht Club on the Indian River, with adequate parking and launching facilities. This Yacht Club is reserved for residents of Sebastian Highlands only.'
"The defendant never authorized any of its sales personnel to represent that Collier Creek was to be extended into the Sebastian River in a northerly or northwesterly direction for purposes of navigation. One of the defendant's officers was asked:
`Do you have any knowledge of any of the sales personnel making representations that this creek (Collier Creek) was to extend into the Sebastian River during the 1957 to 1960 era?'
and his answer was:
`No, sir. If we did, we would stop it immediately, but there was nothing like that.'
"Sebastian Highlands Subdivision, as originally planned, lay entirely north of the Fellsmere Highway or Road. Later, property south of the Fellsmere Road was obtained and in the latter part of 1959 or 1960, was included in an enlarged plan of Sebastian Highlands Subdivision. In these enlarged plans, Collier Creek to the south or southeast joined Collier Waterway and Collier Waterway joined Elkcam Waterway and Elkcam Waterway joined Sebastian Creek, an extension of Sebastian River. Collier Waterway and Elkcam Waterway were not navigable into the Sebastian Creek, however, as there was a dam on Elkcam Waterway some distance back from Sebastian Creek. The testimony of various witnesses with reference to Collier Creek running into the Sebastian River involves a time period when the enlarged plans were in existence and sales were being made in that portion of Sebastian Highlands Subdivision lying south of Fellsmere Road, and this fact must be kept in mind when considering such testimony.
"Plaintiffs alleged in their complaint that defendant's agent showed them on a large map where Collier Creek was to join the Sebastian River as a navigable *576 canal. The documentary evidence fails to substantiate this allegation. The evidence shows that the map which was on a wall in the Yacht Club sales office on March 7, 1958, and seen by the plaintiffs at that time, and the brochures, copies of which were mailed to the plaintiffs with the proposed contract for plaintiffs to sign, did not show Collier Creek connecting with the Sebastian River, but showed Collier Creek running into a proposed lake at the boundary of defendant's property and proposed development. The plaintiffs were at the Sebastian Highlands Subdivision on March 7, 1958, prior to making the initial deposit on the lot and prior to executing the contract for the lot. They were again at the subdivision for a week around June 12, 1959, prior to contracting with the defendant for the construction of their home. It appears from the evidence as a whole that an inspection of Sebastian Highlands Subdivision and Collier Creek would have raised doubts in the mind of a reasonably prudent individual as to the likelihood of Collier Creek being made navigable into the Sebastian River.
"The testimony as to whether or not the alleged misrepresentation was made is in conflict. The plaintiffs and the defendant were trading at arm's length and no fiduciary relationship existed between them. It is well settled, as a broad generalization, that a person to whom false representations have been made is not entitled to relief because of them if he might readily have ascertained the truth by ordinary care and attention, and his failure to do so was the result of his own negligence. Where the means of knowledge are at hand and are equally available to both parties, and the subject matter is equally open to their inspection, if one of them does not avail himself of those means and opportunities, he will not be heard to say that he was deceived by the other's misrepresentations. See Potaker [Potakar] v. Hurtak, Fla. 1955, 82 So.2d 502; Camardella v. Courtright, 1936 [126 Fla. 536], 171 So. 225; and Davis v. Dunn, Fla. 1952, 58 So.2d 539.
"The contract between the plaintiffs and the defendants contained an exclusionary provision, as follows:
`This application constitutes the entire agreement between the parties and may not be changed orally. It may be changed only by agreement in writing, signed by the parties against whom the enforcement of any waiver, change, modification or discharge is sought. No waiver of any provision of this agreement shall be construed as a continuing waiver of such provision on any subsequent occasion unless such waiver is in writing and states explicitly that it is intended to modify this agreement. The Subdivider is not liable nor bound in any manner by express or implied warranties, guarantees, promises, statements, representations, or information pertaining to said lot, made or furnished by any real estate broker, agent, employee, servant or other person representing or purporting to represent the Subdivider, except as such warranties, guarantees, promises, statements, representations or information are expressed and specifically set forth herein or in any written amendment hereto as aforesaid.'
"Such recital is evidence, apparent in the record, that plaintiff did not, in fact, rely upon the alleged misrepresentations. See Fote v. Reitano [Fla.], 46 So.2d 891-892. This contract itself shows that the alleged representations were not relied on, as the plaintiff could have inserted provisions therein to protect themselves against the contingencies covered by the alleged representations, but failed to do so. See 23 Am. Jur. page 941, which cites Nounnan et al. v. Sutter County Land Co., 81 Cal. 1, 22 P. 515 [6 L.R.A. 219], where the following appears:
`This is an action for damages for fraudulent representations alleged to have been made by the respondent to induce the appellants to enter into a contract to construct a levee upon the lands of the former. * * * The representations *577 relied upon as fraudulent are thus stated in the complaint: "That on the 13th day of August, 1884, at said city and county, the defendant represented to the plaintiffs that the defendant wished the plaintiffs to construct a certain levee upon the lands of the defendant in the county of Sutter. The defendant, in order to induce the plaintiffs to do the said work, represented to them that the amount of earth measured in excavation, necessary to be placed upon said levee in order to construct the same, was 350,000 cubic yards. The defendant further represented to the plaintiffs that the character of the earth along the line of said levee was light, sandy loam, and that it was good scraper material. The plaintiffs then stated to the defendant that if the quantity exceeded 350,000 cubic yards, or, if the adjacent earth varied from that stated, they would not do the said work, and proposed to go upon the ground and examine the same. Thereupon the defendant dissuaded and prevented them from doing so, and said that the plaintiffs could entirely rely on the accuracy of said statements. The defendant stated to the plaintiffs that the defendant had made a careful survey and measurement of said work, and had fully informed itself of the character of the said material. Both and all of said representations were made with the intent to induce the plaintiffs to enter into the contract hereinafter mentioned. The plaintiffs relied upon the said representations, and were induced by them to abstain from examining the premises. The premises are about one hundred and fifty miles from San Francisco, and it would have required many days of examination, surveys and measurements to have ascertained the truth or falsity of said representations." It is alleged that the plaintiffs relied, and had a right to reply, upon these representations, and that they were thereby induced to enter into the contract without investigating for themselves the matters about which the representations were made. * * * "That both of said representations were untrue. The fact was that the cubic contents of the said levee were such that it required 500,000 cubic yards, as aforesaid, to construct it. And the character of said adjacent earth was, except very near the surface, stiff adobe, and to a great extent hard-pan, both of which are more difficult to remove than light, sandy loam. The defendant at said time had reasonable ground to believe, and did believe, that both of said representations were not true, and to believe, and did believe, the facts to be as hereinabove set forth * * *. On the said 16th day of December the plaintiffs, by reason of the matters aforesaid, quit work under said contract, abandoned the same, and declared to the defendant that they did abandon and repudiate the same, and have ever since done so, and they demanded of defendant the reasonable value of the work done. The reasonable value of the said work was $57,120, and the plaintiffs admit that they received from defendant, in the premises, $36,350. But the same was paid before the plaintiffs discovered any of the facts regarding quantity and quality. The capital of the plaintiffs was wholly exhausted in the performance of said work. The plaintiffs have been damaged in the premises in the sum of $20,700. And therefore the plaintiffs pray judgment against the defendant in the sum of $20,700 and costs."
`It will be seen that there are two representations relied upon, viz., that the amount of earth in excavation necessary to construct the levee was 350,000 cubic yards, and that the character of earth along the line of said levee was light, sandy loam and good scraper material.
* * * * * *
`It is evident from the contract itself that the plaintiffs did not regard either of these representations as material, and that they did not rely upon them. They could have protected themselves against both of the contingencies covered by the representations by their contract. They *578 were by the terms of the agreement to have a fixed sum per cubic yard for the work. Therefore the amount of earth necessary to be moved in order to complete the work was immaterial, except that they were required to have the same completed within a certain time or forfeit a part of their compensation. They could easily have guarded against this by providing that if the work overran the quantity named a longer time should be allowed them. As to the representation that the material was of a kind that would be easily worked, they could have protected themselves by providing that for that class of work they should have 12 cents per cubic yard, and for more difficult or expensive material to handle a greater sum. To have inserted such provisions in the contract would have been but an act of common prudence. If they had regarded these matters as material and contracted with reference to them, they would no doubt have been inserted.
`Treating these as a part of the negotiations leading up to and forming the basis of the contract, we must presume that the entire negotiations of the parties were included in the written contract as executed, and, so presuming, we must hold that they were bound to move the earth contracted to be handled, and to do it within the time named, without reference to its quantity or quality. Civil Code, § 1625; Pickering v. Dowson, 4 Taunt, 779. This was their contract. Treating them as mere representations made to induce the making of the contract, the contract itself furnishes sufficient evidence of the fact that they were not relied upon, and were not regarded by the plaintiffs as material.'
"If navigable water from their home to the Sebastian River was of importance to the plaintiffs, prudence dictated that they require a provision thereon in the contract. The plaintiffs' failure in this respect is evidence that they did not rely upon such representation and that such representation was not regarded by them as material.
"The rule is that frauds and misrepresentations, insofar as rescission is concerned, are never presumed and must be established by clear and convincing proof. 14 Fla.Jur., 642, Sec. 83; Welbourn v. Cohen, (Fla.App. 1958) 104 So.2d 380; Graessel [Graessle] v. Schultz, (Fla. 1956) 90 So.2d 37; and Biscayne Boulevard Properties, Inc. v. Graham, (Fla. 1953) 65 So.2d 858. The plaintiffs have failed to sustain the burden of proof in the manner required by law in cases of this nature.
"In addition to the plaintiffs' failure to sustain the burden of proof in the manner required, the Court further finds from the evidence that the plaintiffs moved into their house in December, 1959. In April, 1960, Mrs. Scocozzo commenced complaining about the alleged failure of the defendant to make Collier Creek navigable to the Sebastian River in a northwesterly direction. Mr. Scocozzo testified that some time during 1961 he made a personal investigation of the lay of the land and found that to so extend Collier Creek would be impossible. He further testified that about the same time he heard that the General Development Corporation had never intended to make Collier Creek navigable to the Sebastian River. On January 23, 1962, Mrs. Scocozzo wrote to General Development Corporation, asking that defendant rescind the transaction, stating as a fact that Collier Creek not now and will not ever connect with the Indian River via the Sebastian River. The letter also asserted that the plaintiffs have had `two years of aggravation because of a thoroughly unsatisfactory heating system * * * your records will show the amount of money you have spent trying to remedy this situation. But today we are still dissatisfied and do not feel that we can go along with any more attempts to improve the system.' On January 31, 1962, defendant replied to the plaintiffs, stating that the company never *579 planned to make Collier Creek a navigable waterway to the Sebastian River and refusing to rescind the transaction through repurchase of the property. In June, 1962, plaintiffs again stated to defendant's representative that they were unhappy with their house because Collier Creek was not navigable to the Sebastian River and because of the heater. Defendant's representative told plaintiffs that defendant would install an entirely new heater if plaintiffs would be happy with the situation. Later the plaintiffs advised the defendant to install another heater. Defendant then expended $1200.00 in installing a completely new heating system.
"Rescission and cancellation are harsh remedies and therefore not favored by the courts, Courts of equity will not grant the remedy unless it clearly appears that the claimant is entitled thereto and has not by his own conduct waived his right to the relief claimed. Because of this view, slight circumstances indicating a purpose or intent of the claimant to waive the right will bar relief. See Rood Company v. Board of Public Instruction, (Fla. 1958) 102 So.2d 139-142. One of the most familiar applications of the rule relating to the acceptance of benefits arises in the case of contracts. It has been repeatedly held that a person by the acceptance of benefits may be estopped from questioning the validity and effect of a contract; and, where one has an election to ratify or disaffirm a conveyance, he can either claim under or against it, but he cannot do both, and having adopted one course with knowledge of the facts, he cannot afterwards pursue the other. See Hendricks v. Stark, (1930) [99 Fla. 277] 126 So. 293-297. The plaintiffs, through accepting benefits (a new heater) under the contract, with knowledge of the facts, have waived their right, if any they ever had, to rescind the contract and deed and are now estopped from seeking such relief.
"The plaintiffs having failed to sustain the burden of proof in the manner required by law in cases of this nature, and through accepting benefits, having waived their right to rescind, the complaint must be dismissed."
From a study of the evidence and law involved herein, we find no error and affirm the lower court.
Affirmed.
ANDREWS, Acting C.J., and KANNER (Ret.), Associate Judge, concur.