**In re CASCADE INTERNATIONAL, INC., Debtor.**

**CONSTON CORPORATION, Appellant,**

v.

**The GOVERNOR AND CO. OF The BANK OF SCOTLAND, Appellee.**

**No. 92-8316-CIV-ARONOVITZ.**

United States District Court, S.D. Florida.

Nov. 24, 1992.

Mark D. Bloom and James P.S. Leshaw, Greenberg, Traurig, Hoffman, Lipoff, Rosen & Quentel, Miami, FL, for The Governor and Co. of Bank of Scotland.

Jerry M. Markowitz and Steven H. Naturman, Markowitz, Davis and Ringel, Miami, FL, David M. Doret and Mark L. Heimlich, Wolf, Block, Schorr & Solis–Cohen, Philadelphia, PA, for Conston Corp.

## ORDER AFFIRMING PARTIAL FINAL JUDGMENT

ARONOVITZ, District Judge.

This appeal arises out of an adversary proceeding in the Bankruptcy Court for the

Southern District of Florida brought by The Governor and Company of the Bank of Scotland ("Bank") seeking the remedy of rescission to set aside the conversion of $7,500,000.00 of the debt of Conston Corporation ("Conston") owed to Cascade International, Inc. ("Cascade"), in exchange for the issuance to Cascade of 10,000,000 shares of Conston common stock (the "Conversion").

At the behest of Conston, the Bankruptcy Court spared no effort to bring the matter to immediate trial and decision. The compressed time frame for discovery and trial preparation was remarkable; the adversary proceeding was filed on February 12, 1992 and tried less than two weeks later. The trial took two days and consumed 300 pages of testimony, which was part of a total appellate record consisting of 2,023 pages in two volumes. After these extraordinarily expedited proceedings, the Bankruptcy Court set the Conversion aside, memorializing its rulings in a 48 page oral opinion rendered on February 27, 1992. On March 16, 1992 the Bankruptcy Court entered the Partial Final Judgment and this appeal followed.

The Court has considered the briefs on appeal, the arguments of counsel, the trial transcript, the decision of the lower court, and the applicable law, and is otherwise fully advised in the premises. In accordance with Fed.R.Bank.P. 8013, the Bankruptcy Court's findings of fact are not to be set aside unless clearly erroneous. *In re Downtown Properties, Ltd.*, 794 F.2d 647, 651 (11th Cir.1986). As the affirmative defenses raised by Conston involve such questions of fact and are equitable in nature, the Bankruptcy Court's application of the law to the facts so found is not to be overturned absent an abuse of discretion. *Conagra, Inc. v. Singleton*, 743 F.2d 1508, 1516 n. 12 (11th Cir.1984); *Time Oil Co. v. Wolverton*, 491 F.2d 361, 365 (9th Cir. 1974), *cert. den*, 417 U.S. 947, 94 S.Ct. 3072, 41 L.Ed.2d 667; *In re Barsky*, 85 B.R. 550, 554 (C.D.Cal.1988).

THIS COURT HEREBY ACCEPTS, RATIFIES AND ADOPTS THE FINDINGS OF FACT AND CONCLUSIONS OF LAW RENDERED IN THE BANKRUPTCY COURT'S ORAL OPINION BY THE HONORABLE ROBERT A. MARK, UNITED STATES BANKRUPTCY JUDGE, AND ACCORDINGLY THE COURT HEREBY AFFIRMS THE DECISION OF THE BANKRUPTCY COURT.

In keeping with the parties' interest in obtaining a speedy resolution, the Bankruptcy Court rendered its decision in the form of oral recitations of findings of fact and conclusions of law, providing no written findings of fact or conclusions of law. Consequently, this Court deems it more appropriate to extract the relevant and pertinent portions of the oral opinion, as hereinafter set forth.

*Findings of Fact* *

Beginning at page 5 of the Bankruptcy Court's oral opinion on February 27, 1992,

---

\* Herewith follows a description of the cast of players referred to in Judge Mark's opinion. Reference is made to the appropriate pages of the two-volume appellate record for the information contained herein.

1. *Mr. Lindsay M. Forbes* was a senior vice-president of the Bank of Scotland employed in its representative office in Jacksonville, Florida during the relevant time period. Subsequently he became a director of the British Linen Bank, a subsidiary of the Bank of Scotland, located in the United Kingdom. (See page 85 of the February 21, 1992 trial transcript at Appellate Record, Volume I, page 662a.)

2. *Mr. John T. Sirmans, Jr.,* a director and former Vice President and Corporate Secretary of Conston Corporation, was also a director of Cascade International, Inc. and has since become its President. He was an experienced banker and acted as Cascade's liaison with the Bank of Scotland. (See pages 5–23 of John Sirmans' deposition testimony at Appellate Record, Volume II, pages 1346a–1364a.)

3. *Mr. Victor G. Incendy* was Chairman and Chief Executive Officer of Cascade International, Inc. and Chairman and President of Conston Corporation at the time of the Conston debt restructuring; he subsequently became a fugitive. (See page 10 of the Bank of Scotland's Complaint at Appellate Record, Volume I, page 530a.)

4. *Mr. Lawrence Moses* was a director of both Cascade International, Inc. and Conston Corporation. (See page 6 of Plaintiff's Pretrial Memorandum at Appellate Record, Volume I, page 563a.)

5. *Mr. Ira Quint* was a director and President and Chief Executive Officer of Conston Corporation. (See page 4 of Ira Quint's deposition testimony at Appellate Record, Volume II, page 1607a.)

the Bankruptcy Court found the following:

[T]he Bank ... is a bank organized in the United Kingdom, having assets of approximately $40 billion. It has a representative office in Jacksonville, Florida.

[Conston] is a public corporation whose stock ... was traded on the American Stock Exchange at all times material to this dispute. Approximately 60 percent of the common stock of Conston is owned by ... Cascade. Conston also has numerous public shareholders.

The Bank of Scotland entered into certain loan transactions with the debtor in this case, Cascade. As collateral for a $5 million revolving facility, Cascade assigned to the bank certain debt owed to Cascade by ... Conston. The debt from Conston to Cascade was and is secured by all or virtually all of Conston's property.

This ... proceeding arises out of the ... conversion by Cascade and Conston of the collateral pledged to the bank by Cascade as security for the $5 million revolving loan, without the written consent of the bank as required by the loan documents.

[T]he bank seeks ... declaratory judgment ... that the transaction was never validly consummated and thus should be declared null and void. Alternatively, the bank seeks rescission of the debt conversion transaction.

Conston and Cascade urge the Court to deny equitable relief. They claim that the bank is not entitled to rescind because its alleged conduct after learning of the swap supports equitable defenses, including waiver, ratification and laches. Conston and Cascade also deny the allegation that the transaction was not validly consummated in the first instance.

Then, beginning at page 7 of the Bankruptcy Court's oral opinion, it describes the procedural history of this case, as follows:

Cascade filed a voluntary Chapter 11 petition in [the Bankruptcy] Court on De-cember 16, 1991. The adversary proceeding as filed arose from a preliminary hearing before [the Bankruptcy] Court on a motion for stay relief filed by the bank on January 30, 1992. That motion sought, among other things, relief to commence an action in a court of competent jurisdiction to rescind the debt conversion.

At the hearing ... Conston ... advised the [Bankruptcy] Court of [its] allegedly precarious financial condition and inability to obtain financing until the questions or cloud arising over the capital structure was eliminated by a determination as to the validity of the debt conversion.

Conston at the hearing stipulated to the jurisdiction of [the Bankruptcy] Court to resolve this issue by way of an adversary proceeding to be commenced by the bank and the parties all agreed to go to trial on an expedited basis.

As a result of that hearing, [the Bankruptcy Court] entered an order on February 13, 1992 and in part of that order ... found and determined that exigent circumstances exist requiring prompt resolution of the rescission action in order to eliminate uncertainties regarding Conston's capital structure which allegedly precluded it from obtaining working capital financing.

The trial ended on February 21, 1992 and closing arguments were heard by the Bankruptcy Court on February 24, 1992. Subsequently, on February 27, 1992, beginning at page 11 of its oral opinion, the Bankruptcy Court made findings of fact, as follows:

The facts here are largely uncontested. The parties agreed to the authenticity of all the relevant loan documents between Cascade and the bank and between Cascade and Conston. With the exception of one or two dates of receipt of certain documents ... the parties basically were

---

6. *Mr. Earle Spokane* was Executive Vice President of Finance of Conston Corporation. (See page 6 of the February 18, 1992 deposition testimony of Earle Spokane at Appellate Record, Volume II, page 1505a.)

7. *Mr. Hugh Van Seaton* was Vice President of the Bank of Scotland, based in its Jacksonville, Florida office. (See pages 8–14 of Hugh Van Seaton's deposition testimony at Appellate Record, Volume II, pages 1633a–1639a.)

in agreement on what was sent, who received it and when it was received ...

There were some material facts at issue. One involved ... what ... the non-Cascade related officers of Conston knew about the bank's loans to Cascade and ... when did they first learn about the assignment of the Conston notes to Cascade. Resolution of this issue bears on whether Conston acted reasonably in proceeding with the swap without the written consent of the bank.

[T]he terms of the loan transactions are not in dispute ... With respect to the Cascade and the Bank of Scotland, on June 13, 1991, the bank entered into a $5 million revolving credit agreement, ... the 'revolving credit facility.' Although it was dated as of May 31, 1991, the testimony reflected that the documents were not executed and no funds were advanced until June 13th.

The collateral for the revolving credit facility consists primarily of an assignment by Cascade of certain debt, ... the 'Conston debt,' owing to Cascade by Conston and certain of its affiliates. The Conston debt is secured by all of Conston's property, including the stock of each of its subsidiaries, and this [is] the 'Conston collateral.' The assignment was perfected by a collateral assignment of notes and security interests executed by Cascade in favor of the bank, also dated May 31, 1991. [T]his [is] the 'collateral assignment[.]'

... Pursuant to the collateral assignment, the Cascade revolving credit facility is secured by all of Cascade's right, title and interest in and to certain instruments evidencing the Conston debt and the Conston collateral.

The bank introduced into evidence the collateral assignment, which is noted as Exhibit 5, and provided testimony regarding the significance of the collateral assignment to its credit decision. The recital in the collateral assignment itself, ... Recital C, provides that: 'The lender is willing to make the loan only if the borrower secures the borrower's obligations under the note with a collateral assignment of the notes and loan agreements described in Section B above and related security and guarantees,' and Section B refers to the various Conston debt and Conston instruments.

Mr. Forbes, the bank's senior vice president in the Jacksonville office, also testified at trial that the collateral assignment was a critical part of the underwriting consideration by Bank of Scotland. Mr. Sirmans, an officer of Cascade and Conston, also acknowledged in his testimony that he offered this collateral as a significant aspect of the negotiations that led to the credit facility. Therefore, from the perspective of the bank, it was an essential element of the transaction that Cascade's obligations under the revolving credit facility be secured by the Conston collateral.

Relevant to the Court's consideration of the equitable claims and defenses is the fact that prior to the closing of the credit facility Cascade and Conston had already discussed and generally agreed to the debt conversion.

Referring now to Exhibit P-11, which was a memorandum to the board of directors of Conston Corporation prepared by Mr. Sirmans on May 21, 1991, [sic] and in that memorandum he includes a draft resolution for the Conston board of directors to adopt, ratify and approve what is described essentially as the debt conversion transaction. It is thus clear that from the evidence even prior to the closing of the Cascade credit facility, Cascade and Conston had formulated an undisclosed intention to convert the Conston collateral into equity and ... this collateral was critical to the bank's underwriting of the loan to Cascade in the first instance and, despite his experience as a banker and the fact that he was the primary representative of Cascade in the negotiations with the bank, the intention or even the discussions or consideration of the debt conversion were not disclosed by Mr. Sirmans to the bank prior to the closing.

[With regard to] the loan documents and their reference to the Conston debt, the covenants of the collateral assign-

ment provide in part that: 'Unless the lender shall otherwise agree in writing, the Borrower—' in this case Cascade, may: '—not modify, amend, renew, release (in whole or in part), extend or satisfy any of the collateral instruments (or any of their terms), or grant any concessions or forbearance in connection with the Collateral Instruments or waive any of the borrower's rights or remedies thereunder,' and ... that phrase, Collateral Instruments, does refer back to the various notes and pledges that constitute the Conston obligations to Cascade.

The covenants also provide that: 'The Borrower shall not exercise any right under the Collateral Instruments that would lessen the liabilities of Conston and its subsidiaries or change the maturity dates set forth therein.' This is also part of ... Exhibit 5.

Then, by way of remedy, in Paragraph 4 of that same exhibit, that is, the collateral assignment, there is a provision that provides that: 'Any action by the Borrower in violation of this Paragraph 4 shall be voidable by the Lender.'.

It is this relief which the bank seeks in this adversary proceeding and the crux of this case is whether the bank is entitled to exercise this right.

I also note that the Cascade revolving credit agreement restricts Cascade's rights in the Conston debt. It expressly provides that: 'No portion of the Conston loan funded by advances under the loan shall be converted to equity.'

[With regard to] the Conston and Cascade loan relationship, I ... note with some importance that there are common officers and directors of the two companies, in addition to Cascade's majority ownership of the stock of Conston. John Sirmans, the primary liaison between Cascade and the bank, was also an officer of Conston and, in fact, provided the bank with Conston's financial information upon the bank's request. Victor Incendy, the now fugitive former chairman of Cascade, was at the time of these loan transactions also chairman of and a director of Conston. Lawrence Moses was also a member of both boards.

... The non-Cascade Conston officers [are] Mr. Quint and Mr. Spokane.

... I find that whatever Mr. Quint and Mr. Spokane actually knew or should have learned if they had exercised more diligence, 'knowledge' by Conston of the loan transactions between Cascade and the bank and the recitals and covenants within those loan documents existed. I find that based upon the direct and significant involvement of Mr. Incendy and Mr. Sirmans in Conston's financial affairs.

[With regard] to the actual Cascade/Conston loans, on February 14, 1991 Cascade and Conston entered into a term loan agreement in which Cascade agreed to loan Conston up to $5–½ million. On March 6, 1991 Cascade and Conston entered into a revolving loan agreement in which Cascade agreed to make available to Conston a revolving line of credit up to $4 million. Conston was in bankruptcy when both agreements were made and as security Cascade was to receive a super-priority lien on all of Conston's property. The revolving loan was approved by the Bankruptcy Court and the term loan was approved on April 18, 1991 in the order confirming Conston's plan of reorganization.

In connection with the two loans from Cascade to Conston, Conston executed promissory notes payable to Cascade in the face amount of $5–½ million and $4 million respectively. Both of these notes further provide that only the amount actually owed, and not necessarily the face amount, is what will be due. It is these Conston notes that were the subject of the debt conversion.

[With regard to] the debt conversion transaction, the bank argues initially that the debt conversion never was consummated, rendering moot both the rescission claim and the defenses to that claim.

While it is true that there was no formal agreement documenting the swap and also true that the transaction was implemented in what can generously be described at least as an unusual way for two public companies with sophisticated

counsel, I still reject the bank's argument that the transaction was not consummated. The transaction may be voidable, but I do not find it unconsummated and void from the inception, and in that regard the evidence showed the following, and here I am following almost verbatim several of the findings submitted by Conston:

In or about June 1991, Conston issues a press release that it planned to seek shareholder approval of an exchange of $7.5 million of Conston's indebtedness to Cascade for 10 million shares of Conston stock.

The terms of the debt conversion were negotiated as to the amount of shares to be exchanged for the Conston debt between the representatives of Cascade, on the one hand, and Messrs. Quint, Spokane and the independent directors for Conston on the other.

Although I agree with that proposed finding in terms of evidence of such negotiations, it doesn't change the conclusion ... that knowledge by Conston of the transactions between Cascade and the Bank of Scotland must still be imputed by virtue of the involvement of Sirmans, Incendy and others in Conston's financial affairs.

The board of Conston approved the conversion and submitted it to a shareholder vote. There was a proxy statement issued and sent to shareholders in connection with the vote. A meeting of shareholders was held on September 5, 1991 and the transaction was approved. The stock was then issued by Conston's transfer agent on October 2nd and the debt conversion was publicly reported by Conston. All of those material facts were supported by documents introduced into evidence.

Having found that the transaction was thus consummated, I ... turn to the pivotal issue which involves when did the bank learn of the swap and what did they do in response to that knowledge.

Certain important facts are not in dispute with respect to the transaction and what the bank did or didn't do.

First of all, Cascade never requested or received the written consent required by the loan documents, and second, the bank never told Sirmans it would waive the written consent requirement, referring to Sirmans' testimony at pages 153 and 154 of his deposition and three, [sic] Cascade knew that any consent would have to be approved by bank representatives in Scotland and could not be authorized by Mr. Seaton or Mr. Forbes out of the Jacksonville office.

One of the first key documents in connection with the bank's knowledge is ... Exhibit 16, ... which is the July 19, 1991 memo from Mr. Seaton to Mr. Sirmans. Among other things, in that memo the bank, through Mr, Seaton, advises Cascade:

For us to clearly understand what you are requesting the Bank's agreement to, we would appreciate a written formal request from Cascade International, Inc., with a review of the purposes of the foregoing recapitalization, the pro forma financial accounts of both Cascade and Conston, and a revised cash flow statement. In addition we would require current financial accounts for both Cascade International, Inc. and Conston Corporation. We may request additional information as well in considering the advisability of the request from Cascade.

Under the present agreement Cascade International, Inc. agrees not to allow its loans to Conston Corporation to be less than the loans to Conston which have been funded by the Bank.

This memo ... provided clear notice to Cascade that the loan agreement would be enforced[.] [I]n looking at the testimony itself with respect to consent, ... on pages 153 and 154 of the deposition testimony of Mr. Sirmans, Exhibit P–14, the deposition on February 19th:

Q. ... At any time after May 31, 1991, did Mr. Seaton or any other officer or representative of the Bank of Scotland tell you verbally or in writing that the conversion of the Conston debt to equity would not require the

written consent of the Bank of Scotland?

A. Well, I believe there is a memorandum here from Mr. Seaton that tells me that it would.

Q. That it would require the written consent, that is your testimony?

A. That's what I said.

... It is clear from the evidence that the memorandum that Mr. Sirmans is referring to is ... the exhibit that I just [quoted], putting Cascade on specific notice that the written consent requirement would be enforced.

The defendants place much emphasis on the documents which were transmitted to the bank in the August, September and October time frame of '91 indicating that the swap was going forward and, ... going to the Conston proposed findings which ... fairly describe the documents that were sent, let me run through some of those:

On August 21, 1991, Cascade wrote a letter to the bank enclosing the proxy statement of Conston relative to the September 5, 1991 meeting of Conston shareholders. [T]hat may be the letter with which over there was a dispute as to when it was received.

The Conston proxy statement clearly says that the conversion is one of the items to be considered by Conston shareholders at the meeting. As noted, on September 5th the shareholders approved the conversion and by letter of September 10th the bank was advised that all three shareholder proposals were approved at the September 5th meeting. The bank admits receiving this letter no later than the week of September 17th.... Mr. Seaton may have testified that it might have been as late as the 25th, but anyway in the second part of September certainly the bank had knowledge that the shareholders had approved the transaction. The letter of September 10th also stated that additional information will be provided as to issuance of the shares that were authorized by Conston's shareholders.

Then by letter dated September 17th Conston's 10–K was transmitted to the bank by Cascade. The 10–K contains a description of the conversion transaction and the letter which accompanied it further informed the bank that 'the 10 million shares will be issued to Cascade International on October 4, 1991.' Again, the bank admits receipt of this letter sometime during the week of September 17th or shortly thereafter.

While certainly these documents show that Conston was taking steps necessary to obtain approval from its shareholders to proceed with the transaction, there is nothing about the bank's conduct in this time frame which would indicate to the Court a waiver of its rights to enforce the loan agreement.

Moreover, in terms of what Conston did and whether it was reasonable, I point ... to the testimony of Spokane and Quint that in the summer of 1991 they were told that the proposed swap may be prohibited by Cascade's loan documents with the bank. They had this knowledge and nevertheless relied on Incendy and Sirmans to deal with the problem, and since Conston and Cascade argued at trial all of the horribles [sic] that may arise in prejudice to Conston and its shareholders and creditors, ... it is important to look at what action was or was not taken by the non-Cascade Conston officers in response to this knowledge that was certainly given to them in the summer.

Looking at pages 45 to 48 of the deposition of Earle Spokane on February 20th, Mr. Spokane says that:

A. I was informed by Van Seaton that there may be a problem with the debt conversion in the loan agreement and I stated at that[,] was John Sirmans aware of this, and Van Seaton answered, I believe so.

I called John Sirmans to verify whether he was aware of it, and John Sirmans said, I am aware of it, and don't worry, we are going to take care of it....

Q. Was it your understanding at the time of the conversation with Mr.

Sirmans that a debt for equity swap may have caused a problem in some sort of a loan agreement between Cascade and the Bank of Scotland?

A. Yes....

Q. Did you care about the existence of the problem?

A. I was told that the problem might be taken care of, and I had no reason to believe that the problem was not taken care of.

Of similar tone and result was the testimony of Mr. Quint on page 13 of his deposition where he also acknowledges he was advised of the potential problem with going through with this transaction based on the loan agreements between Cascade and the Bank of Scotland.

At page 27 of its oral opinion the Bankruptcy Court continued its findings of facts, as follows:

[I]t is worth noting that shareholder approval or the seeking of shareholder approval for the transaction was not tantamount to implementation of the transaction and I do not find that the bank was unreasonable in expecting that it would obtain all the information it requested and I note that Mr. Sirmans testified that he never provided all the information and the bank was not unreasonable in expecting that the loan agreement would be complied with and that the transaction would not be implemented without written consent. Therefore, communicating all of these documents with respect to the proxy and the shareholder approval was not equivalent to the bank having knowledge that the transaction was actually implemented and certainly no inference could be drawn that they waived or sat on their rights during this time period.

Now, we move to what the bank did or didn't do when it learned that the transaction had actually occurred.

On October 4th the Conston shares were issued and by October 23rd the bank admits that it had learned of the nature and extent of the debt restructuring. The bank, by the testimony of Mr.

Seaton, admits that it was alarmed by the knowledge that the transaction occurred and there was a letter that was introduced in which Mr. Sirmans acknowledged that the transaction constituted a technical default under the loan.

There were various meetings and other documents during this time period. I will refer again to the proposed findings [by Conston] which ... set out essentially the events in that time frame[.]

[On] October 25, 1991, a representative of the bank met with a representative of Cascade to give Cascade two documents constituting a pledge and security agreement. The documents acknowledged that the ... debt conversion has taken place and seek to perfect a secured position for the bank in the Conston shares issued in the conversion. The documents, in effect, also sought to extend the bank's rights through a pledge of that collateral to further secure both Cascade loans.

On October 25th the bank's counsel separately wrote to counsel for Cascade detailing the items needed to complete the pledge transaction and on November 4th the stock certificates were forwarded to the bank by Cascade, all of that going toward the bank taking action to perfect a security interest in the stock that was issued pursuant to the conversion transaction.

... There was also, what was introduced as Exhibit 35, an internal memorandum dated November 4, 1991 in which the bank, through Mr. Seaton, ... the author, traces the history of the transaction and certainly the tone of this memorandum is not one of alarm, nor does it suggest that the bank was immediately interested in undoing it. The memorandum, in part, states:

In early October, Cascade converted $7.5 million for 10 million shares which resulted in pro forma net equity of $14.4 million. In converting the $7.5 million, Cascade inadvertently converted part of the loans which had been funded by the bank, and thus we became partially unsecured. Following receipt of the Conston 10–Q on October

24, 1991, we reviewed the 10–Q and determined that a default had possibly occurred. We advised Cascade of the technical default we thought had occurred and they reviewed the matter and agreed. They immediately arranged to transfer 4,415,000 shares of Conston stock to replace the $2.1 million collateral reduction from the debt conversion.

It was shortly thereafter that significant other events happened with respect to Cascade, and ... that is important to understand in the context of what the bank did or did not do.

On November 19th Victor Incendy disappeared and the total situation at Cascade was obviously much different than what was anticipated by the bank and what was disclosed in Cascade's public filings.

It was only then, on November 22nd, that the bank gave formal notice to Conston that the bank held the Conston notes and that the indebtedness should be paid to the bank, and that no amendments to the loan could be made without their specific consent, and the defendants place great emphasis on the fact that this letter was not sent until November 22nd, that is, a letter that first apprised Conston in formal terms that the bank was holding the notes and that the notes could not be altered without their consent.

[O]n December 4th, in an internal memo, the bank states that on the advice of its lawyers, a formal acceleration letter is being served on Cascade imminently. The memo also refers to the fact that they have a pledge of the additional shares.

Thereafter, on December 6th the bank accelerated the loans and made demand for payment and on December 16, 1991 Cascade filed its petition for relief in [Bankruptcy] Court. January 30, [1992] was the date on which the bank filed its motion for relief from stay and ... announced its intention ... to seek rescission of the debt conversion.

Certainly, in hindsight, the bank could have and perhaps should have demanded rescission sooner. Moreover, [the internal memorandum dated November 4, 1991, excerpted from above] does support a conclusion that the bank was not initially pursuing rescission once it learned of the transaction. Nevertheless, I find that the bank's response must be viewed in the context of the events that were transpiring and in the context of ... which parties had violated agreements at the time.

[I]t is significant that it was Cascade that had breached the loan agreement by going forward with the transaction. As to Conston, I find that Conston had direct knowledge through Incendy and Sirmans that the transaction was prohibited without written consent and, therefore, also proceeded at its peril in going forward with the transaction without the required consent. Even if this had been an arm's length transaction, which it certainly was not, and even if Sirmans and Incendy had no involvement with Conston, which obviously they did, I could not find that the actions of Conston were reasonable, going back again to the fact that [Spokane and Quint] had actual knowledge of a problem that was communicated to them early in the summer.

It is true that Conston and its shareholders and its creditors may be prejudiced if the transaction is rescinded. The shares have been issued, apparently negotiations for financing based on the new capital structure after the swap have been undertaken and certainly, as a court of equity, these potential, if not probable, problems and injuries are relevant.

Still, in reviewing all of the facts and circumstances, it was Conston and Cascade that chose to proceed in violation of contractual obligations, and by so proceeding in clear contravention of what were not only contractual provisions, but were important and specifically negotiated rights of the bank, they proceeded at their peril. If there is injury to innocent third parties that will arise out of the [Bankruptcy] Court's ruling ..., these parties may choose to turn to those that caused the injury, they cannot rely and

turn to the bank which was itself a victim here.

*Conclusions of Law*

 Beginning at page 34 of the Bankruptcy Court's oral opinion on February 27, 1992, the Bankruptcy Court made the following legal conclusions and comments on the evidence:

Mr. Sirmans was a key player in this overall transaction. He was the link between Cascade and the bank and the link between Cascade and Conston. I found Mr. Sirmans to be of questionable credibility in certain aspects of his testimony. For example, his after the fact attempted explanation of why the original notes were not requested from the bank did not ring true. In other respects, his testimony, if true, demonstrated a careless if not deliberately evasive approach to the formal requirements for closing this type of transaction.

I mention, as it was brought out in the evidence, that Mr. Sirmans had considerable experience as a businessman and as a banker and I would point to the following additional facts:

Exhibit P–11 previously referred to[, the memorandum to the board of directors of Conston Corporation prepared by Mr. Sirmans on May 21, 1991,] indicates that there was essentially an agreement to do the swap without giving the bank any notice of such an intention and this agreement had been reached in principle, as evidenced by Exhibit P–11, ... some 20 days before the loan actually closed on June 13th.

Page 92 of Mr. Sirmans' deposition testimony is particularly instructive[.] He says:

Q. Do you contend that irrespective of the absence of such writing the Bank of Scotland agreed or consented to the conversion of debt to equity?

A. I believe they did. They never told me I couldn't do it.

I find this to demonstrate ... either extremely careless or negligent conduct with respect to performance of the loan obligations, if not deliberately evasive actions.

I also note Mr. Sirmans' response to my questioning when I asked him whether, in his experience as a banker, this type of transaction which involved multiple parties and exchange of debt instruments for stock and substitute collateral for a bank, wouldn't this normally take place at a closing where everybody executed the agreements and consents and new security agreements that would be necessary and he said, yes, that would be normal. I am not reading from a trial transcript, but that is what my notes reflect, and I believe I am quoting him accurately when I asked him why it wasn't done in that way in this case, and I believe his answer was, "I don't rightly know."

So, where you have a situation like this where the key player for the borrower has acted so indifferently, if not intentionally in derogation of the lender's rights, I find that very strong facts would have to be present to overcome the bank's ability to enforce its rights under the agreement[,] and ... the bank's conduct must be viewed in light of the events that confronted it. It was not long after learning that the transaction had been consummated that Incendy disappeared and everything came unglued at Cascade. In the face of these rapidly unfolding events, the bank's failure to seek rescission immediately does not support the equitable defenses. I ... turn first to the laches defense under ... black letter law:

Laches is defined as an unexcused delay in asserting rights during the period of time in which adverse rights have been acquired under circumstances that would make it inequitable to displace such adverse rights, and the bank quoted for that proposition *Sample v. Natalbi*, 162 So. 493, a 1935 Florida case.

Here I do not find that there was inexcusable delay by the bank under these circumstances and nor was there reasonable reliance by Cascade or Conston in terms of their actions that would render

it inequitable despite the fact that there may be prejudice to innocent third parties, I do not find it would be inequitable to allow the bank to enforce its rights.

Let me ... discuss Conston's argument that the absence of formal notice until November 22nd set up a defense that the notes were paid prior to any demand on Conston for payment and they went on to argue that as an assignee the bank took the notes subject to existing defenses, including the defense of payment.

As argued by the bank in its post-trial memorandum, this defense fails. For one thing, the notes were never canceled and, indeed, never requested from the bank. Second, given Conston's knowledge of the bank's rights, they are estopped from asserting a payment defense and, finally, although I did not admittedly explore this in depth, nor was it argued in depth by the parties at trial, it does appear to me that because of the protection in the loan documents and under the principle that the bank was a third party beneficiary, the notes could not have been canceled and could not be deemed paid without the bank's consent.

[With regard] to the other issues that relate to the equitable defenses, [Conston's counsel] at trial referred on several occasions to the bank taking the so-called fruits of the transaction by demanding and obtaining a pledge of the stock. I find that the bank's efforts to protect itself after learning of the unauthorized transaction was not a waiver of its rights to pursue other remedies under the loan documents.

As noted earlier, [with regard] to the waiver issue, Sirmans' deposition testimony at pages 153 and 154 of his transcript reflects that he was never told verbally or in writing that the bank was waiving its requirement of written consent. In fact, ... he admits that the July memo from Seaton told him just the opposite, namely, that the transaction would require written consent. Under these circumstances, I don't see how waiver could be inferred or found from the facts.

Conston relies on some general principles of rescission being an inequitable remedy and subject to equitable defenses of ratification, estoppel and waiver and it cites C.J.S. Cancellation of Instruments, and it quotes at length from an ... older Florida case, 1966, Fourth DCA decision, *Scocozzo v. General Development Corporation*, 191 So.2d 572, 579. The quoted language includes statements by the court such as:

> Rescission and cancellation are harsh remedies and therefore not favored by the courts. Courts of equity will not grant the remedy unless it clearly appears that the claimant is entitled thereto and has not by his own conduct waived his right to the relief claimed.

I don't find any problem with these general principles, but I don't find this case supportive of the defenses on the facts here.

First of all, protecting its rights after the breach by getting a stock pledge is not, in this Court's interpretation, the same as accepting the benefits of a contract to which you are a party and then later seeking to rescind the same contract.

Second, as noted by the bank in its closing argument, an important element in the GDC case was the absence of a contractual provision with respect to the alleged misconduct of the seller. By contrast, the bank in this case specifically bargained for the protection of a written consent before the borrower could implement any action that would impair what was indeed the primary collateral for its loan. Under these circumstances, there must be, and is, a strong presumption in favor of enforcement of these rights.

[I]t would be a different case certainly if there was no such provision here and we had to look at the conduct of the parties and determine whether it was equitable to allow the bank to seek rescission. That is not the facts that were presented. Instead, we have a clear contractual provision, it is not just boilerplate language in a long loan document,

we are not dealing with an unsophisticated borrower, the borrower specifically agreed not to do anything to impair the collateral without the express written consent [of the bank] and specifically agreed that any action that it would take without the required consent would be subject to avoidance.

Therefore, the evidence here is simply insufficient to deny enforcement and I therefore reject the defendants' affirmative defenses. The bank did not ratify this transaction, did not waive its clear and specific rights and is not estopped by any other equitable principle from enforcing its rights.

I therefore conclude and declare the following:

One, the debt restructuring violated the collateral assignment; two, the bank is entitled to the equitable remedy of rescission and the debt restructure should be rescinded and canceled.... [T]hree[,] the parties to this proceeding are directed to take all steps necessary to effect a rescission of the debt restructuring transaction.

*Conclusion*

It should be noted that Bankruptcy Judge Mark refused to accept the ratification, waiver, estoppel, laches and payment arguments asserted by Conston Corporation, and found that the proof did not support such affirmative defenses. This Court, likewise, did not find the acts of the Bank of Scotland to be negligent or careless for failing to act sooner in this case.

By having reviewed and adopted the above findings of fact and conclusions of law as enumerated in the Bankruptcy Court's February 27, 1992 oral opinion, the Court hereby AFFIRMS the Partial Final Judgment entered by the Bankruptcy Court on March 16, 1992. Accordingly, the debt restructuring SHALL be rescinded forthwith.

DONE AND ORDERED.